IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELLETA DENSON, as Parent and
Natural Guardian and Next Friend
of AJD #1 and AJD #2, Minor
Children of Rodney Denson,
Deceased, and ANN HERRERA, as
Administrator of the Estate of
Rodney Denson,

     Plaintiffs,

v.

CORIZON, INC. f/k/a Correctional
Medical Services, Inc., DR. TASSEW
TESFAYE, CAMELA ANDERSON,
LPN, and LAQUANTA RUSSELL,

     Defendants.

CIVIL ACTION FILE

NO. 1:12-CV-3890-MHC

## ORDER

This case comes before the Court on Defendants' Motion for Summary

Judgment or, in the alternative, to Dismiss ("Defs.' Mot.") [Doc. 72].  For the

reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This case involves the November 30, 2011, death of Mr. Rodney Denson at

the Fulton County jail and the medical care he received immediately preceding his

passing.  Plaintiffs have sued Corizon, Inc., the contract medical provider for the

Fulton County jail, as well as a doctor (Dr. Tassew Tesfaye) and two nurses (Camela Anderson and Laquanta Russell) who were responsible for providing medical care to Mr. Denson while he was at the Fulton County jail. See Second Amended Complaint [Doc. 70] ("Am. Compl."). Dr. Tassew Tesfaye was the doctor assigned to the critical care unit of the Fulton County jail who treated Mr. Denson during the time he was at that facility. Deposition of Dr. Tassew Tesfaye taken November 9, 2013 [Doc. 86] ("Tesfaye Dep.") at 7, 10. Camela Anderson was a nurse assigned to the Unit Three South of the Fulton County jail who treated Mr. Denson during the relevant time frame. Deposition of Camela Anderson taken February 5, 2014 [Doc. 88] ("Anderson Dep.") at 12-13. Laquanta Russell was a nurse assigned to the medical observation psychiatric unit of the Fulton County Jail who also treated Mr. Denson. Deposition of Laquanta Russell taken March 10, 2014 [Doc. 87] ("Russell Dep.") at 16, 21.

Unless otherwise indicated, the Court draws the following facts from "Defendants' Statement of Material Facts as to Which There in No Genuine Issue of Fact" [Doc. 72-3] ("Defs.' SMF"). The Court must accept as admitted those facts in the moving party's statement that have not been specifically controverted with citation to the relevant portions of the record by the opposing party. LR 56.1B(2), NDGa. The Court has excluded assertions of facts by either party that

2

are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number). Id., LR 56.1B(1). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiffs, as required on a defendants' motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).

Mr. Denson was an inmate at the Macon State Prison who was transferred to the Fulton County jail for a judicial proceeding on November 29, 2011. Defs.' SMF ¶ 5. Mr. Denson's medical records accompanied him on the transfer. They indicated that he had the following medical problems: sarcoidosis, GERD, and nasal septal deviation. Id. The records also indicated that the only medication that was transferred with Mr. Denson to the Fulton County jail was Prilosec (14 capsules of 20 mg). Id.

The following timeline of events in the hours immediately following Mr. Denson's arrival at the Fulton County jail is central to this case:

**2:20 p.m., November 29, 2011:** Mr. Denson completed his medical intake screening at the Fulton County jail where he gave a medical history of sarcoidosis, GERD, and nasal septal deviation. Defs.' SMF ¶ 7. He complained of chest pain

3

due to mucus, but denied discomfort or distress at that time. Id. Mr. Denson reported that he was taking the following medications: Prilosec (20 mg), zinc oxide ointment, Ensure liquid, an albuterol inhaler and Prednisone (10mg). Id. He also reported that his last dose of Prednisone was the previous day, November 28, 2011. Id. His oxygen saturation level was tested during this examination and was 92%. Id. There is no indication that any of the individual defendants were involved with the intake examination.

9:41 to 10:30 p.m., November 29, 2011: Mr. Denson was seen by Nurse Practitioner Reed in the urgent care clinic where he was diagnosed with sarcoidosis, acid reflux and nasal septal deviation and prescribed Prednisone (10mg), Prilosec (30 mg) and an Albuterol inhaler. Id. ¶ 8. Mr. Denson was thereafter assigned to Unit Three South of the Fulton County jail, the housing area in which inmates with chronic medical problems are housed. This portion of the jail has a nurse permanently assigned to it to monitor inmates. Id. Although Prednisone was apparently ordered for Mr. Denson during this encounter with Nurse Reed, there is no written record indicating the drug was ever administered to him at this time despite the fact that it was available in the urgent care clinic. Affidavit of Dr. Lawrence Mendel [Doc 83-1] ("Mendel Aff.") at 4(d)-(f); Tesfaye Dep. 49-50.

**12 to 12:15 a.m., November 30, 2011:** Mr. Denson was seen by Dr. Tesfaye in the urgent care clinic complaining of shortness of breath. Tesfaye Dep. at 137. Dr. Tesfaye noted that Mr. Denson had a history of sarcoidosis and was "making noise like he was wheezing," but the doctor found that there was no wheezing in his chest, no accessory muscle usage in his chest, and no intercostal or subcostal retraction. Tesfaye Dep. at 136-140; Exhibit 2 to the Tesfaye Dep. [Doc. 86-2] at 6. Dr. Tesfaye explained during his deposition that when he observed Mr. Denson, he observed that the wheezing was noise in Mr. Denson's upper respiratory system likely caused by Mr. Denson's septal deviation. Tesfaye Dep. at 138. The doctor also found Mr. Denson's oxygen saturation level was 98%. Defs.' SMF ¶ 9; Exhibit 2 to the Tesfaye Dep. at 6. All of these observations indicated to Dr. Tesfaye that Mr. Denson had no symptoms of respiratory distress and was, therefore, not in respiratory distress as a result of the sarcoidosis at that time. Tesfaye Dep. at 140.

Dr. Tesfaye gave Mr. Denson guaifenesin colitic (the active ingredient in Mucinex) to break up his mucus and an albuterol breathing treatment. Defs.' SMF ¶ 9; Tesfaye Dep. at 140; Exhibit 2 to the Tesfaye Dep. at 6. Dr. Tesfaye noted that Mr. Denson walked by himself back to his floor, which the doctor also viewed as a sign that Mr. Denson was not in respiratory distress at that time. Tesfaye Dep.

at 141.  The medical record created by Dr. Tesfaye indicated the "diagnosis" as "sarcoidosis."  Tesfaye Dep. at 149; Ex. 3 to Tesfaye Dep. at 6.  Dr. Tesfaye also noted that one of Mr. Denson's prescribed drugs was Prednisone, but he did not administer the drug to him during his visit because he believed that Nurse Reed had already done so at Mr. Denson's earlier visitation.  Tesfaye Dep. at 151.

   **1:05 to 1:10 a.m., November 30, 2011:** Mr. Denson complained to the nurse on Unit Three South (Nurse Marvin Faircloth), that he was having trouble breathing.  Russell Dep. at 11.  Nurse Faircloth called to relay this information to the critical care unit.  Id.  Although Nurse Russell was not the urgent care clinic nurse at that time (she was assigned to the medical observation psychiatric unit), the urgent care clinic nurse was not there and fielded the phone call from Nurse Faircloth, put nurse Faircloth on hold, and went to seek the advice of Dr. Tesfaye. Id. at 11-13, 26.  Dr. Tesfaye ordered a check of Mr. Denson's oxygen saturation level and, if it was within normal limits, instructed to leave Mr. Denson where he was on Unit Three South.  Id. at 11-13, 26.

   **1:15 to 1:20 a.m., November 30, 2011:** After receiving Dr. Tesfaye's direction, Nurse Russell went to Unit Three South to personally check Mr. Denson's pulse and oxygen saturation, which was 98%.  Russell Dep. at 27, 31. Mr. Denson told Nurse Russell at that time that he was still having trouble

breathing and notified her that he normally takes Prednisone. Id. Nurse Russell

did not take a stethoscope, nor did she perform a full assessment of Mr. Denson

because there was a Unit Three South nurse with him (nurse Faircloth) and she

operated under the assumption that nurse Faircloth did the full assessment. Id. at

32-33. Nurse Russell testified that she noticed he was taking deep breaths, which

meant to her that he might be having trouble breathing even though his oxygen

saturation level was normal and that he would need to be checked again. Id. at 34,

63. It was Nurse Russell's understanding that Nurse Anderson would check his

oxygen saturation level again. Id. at 63.

Nurse Russell told Mr. Denson that she was going to alert Dr. Tesfaye that

Mr. Denson was still having trouble breathing and that she was going to check on

the Prednisone that was ordered during Mr. Denson's 9:41 examination with Nurse

Practitioner Reed. Id. at 28. Nurse Russell then instructed the Unit Three South

nurse (Nurse Faircloth) to bring Mr. Denson to the urgent care clinic if he is still

having trouble breathing. Id.

Nurse Russell then relayed all of this information to Nurse Camela Anderson

and the nurse who was staffing the urgent care clinic (Nurse Augustina Kwayke).

Id. at 29. Nurse Russell also notified the urgent care clinic office of Mr. Denson's

condition and told Dr. Tesfaye that she examined Mr. Denson personally and that

his oxygen saturation level was 98%. Id. at 30. Dr. Tesfaye responded "Okay. We've already treated him … for shortness of breath." Id. at 28-30. Finally, Nurse Russell consulted Mr. Denson's medical records which indicated that Dr. Tesfaye had personally seen Mr. Denson and that Mr. Denson received Albuterol and Mucinex at 12:15 a.m. Id. at 30. Nurse Russell was not aware of Mr. Denson's sarcoidosis until she reviewed his medical records after she examined him. Id. at 41. After Nurse Russell reported back to Dr. Tesfaye and Nurse Anderson, she returned to her regular post on the medical observation psychiatric unit. Id. at 30.

**1:30 to 1:40 a.m., November 30, 2011:** After her conversation with Nurse Russell, Nurse Anderson walked through Unit Three South and Corrections Officer Bridgette Lewis beckoned her to come over and see Mr. Denson who was complaining that he was having trouble breathing. Anderson Dep. at 20-21. Nurse Anderson was familiar with Mr. Denson, his medical history, and diagnosis, including the fact that he had sarcoidosis, from Mr. Denson's previous stays on Unit Three South. Id. at 24-27. Nurse Anderson examined Mr. Denson at 1:30 a.m., observed that he was sitting up, talking normally, not using any accessory muscles to breathe, "breathing fine," and not in any apparent respiratory distress, and then tested his oxygen saturation level, which was 98% (within the normal limits). Id. at 20, 23, 36, 44-45, 63. Nurse Anderson said that when she examined

8

him, Mr. Denson reported that he had a history of asthma and sarcoidosis, but he was feeling better and that he was getting relief from the breathing treatments he had been given earlier. Id. at 39-40. Mr. Denson told Nurse Anderson that he needed Prednisone. Id. at 40-41. She reported her findings and Mr. Denson's request to the urgent care clinic nurse, Augustina Kwayke. Id. at 34, 41. Nurse Anderson recalls that the urgent care clinic nurse told her that the Prednisone order that was written was not supposed to start until later that day. Id. at 41-44. Nurse Anderson relayed this information to Mr. Denson. Id. at 44.

Nurse Anderson also spoke with Corrections Officer Bridgette Lewis during this time frame. Anderson Dep. at 49. Officer Lewis voiced concerns about Mr. Denson having difficulty breathing. Id. Officer Lewis stated that after Nurse Anderson examined Mr. Denson, she said to Officer Lewis "[w]hen he passes out and falls on the floor, call me." Affidavit of D.O. B. Lewis [Doc. 83-4] ("Lewis Aff."), Ex. A.

**2:26 a.m., November 30, 2011:** Nurse Russell received a call from a member of the detention staff inquiring as to whether Nurse Russell had received Mr. Denson's medication (Prednisone). Russell Dep. at 83-89. Nurse Russell told the detention staff that Mr. Denson had received Albuterol and Mucinex and

9

reminded them to bring Mr. Denson to the clinic if he was having trouble breathing. Id.

**2:55 a.m., November 30, 2011:** Mr. Denson informed Officer Lewis that he was still having difficulty breathing, that he needed his Prednisone and that he "felt as if he was going to die." Lewis Aff., Ex. A. There is no evidence indicating that any of the individual Defendants were aware of this specific complaint.

**3:06 a.m., November 30, 2011:** An entry from a detention staff log indicates that "Inmate Denson still complaining of breathing difficulty. Medical stated they are not giving Denson any treatment." Tesfaye Dep., Ex. 4.

**3:39 a.m., November 30, 2011:** Officer Rashad Wheeler testified that Mr. Denson was banging on his cell door and waving his arms. Wheeler Affidavit, [Doc. 83-4] Ex. A. Mr. Denson was grasping for air and repeatedly falling to the ground. Id.

**3:40 to 3:46 a.m., November 30, 2011:** Nurse Anderson arrived at Mr. Denson's cell within a minute of receiving the call and checked his pulse. Id. Nurse Anderson observed Mr. Denson was making rasping sounds and she made a call to the urgent care clinic for a stretcher to transport Mr. Denson back to the urgent care clinic. Anderson Dep. at 47, 50-51. Once Nurse Anderson made the call, she estimated it took 3-5 minutes for the personnel, a corrections officer, and

10

Dr. Tesfaye to bring the stretcher. Id. at 52; Wheeler Affidavit, Ex. A (indicating stretcher arrived at 3:46).

**4:00 a.m., November 30, 2011:** An emergency room transfer sheet is completed indicating that Mr. Denson was having difficulty breathing, was non-responsive, had no recordable blood pressure or respirations, and his pulse was 36. Tesfaye Dep. at 156-60, Ex. 3. Dr. Tesfaye ordered that an ambulance be called to take Mr. Denson to the hospital. Id. Mr. Denson was pronounced dead upon arrival at the hospital at 5:00 a.m., November 30, 2011. Stauffenberg Dep., Ex. 1.

The autopsy revealed that the cause of death was pulmonary sarcoidosis. Id. at 14. Plaintiffs' expert, Dr. Mendel, testified that Mr. Denson's sarcoidosis was a life-threatening condition that could be exacerbated and lead to his death if not treated appropriately. Mendel Aff. ¶ 7(b). Given Plaintiff's condition, Dr. Mendel contends that part of the standard of care was to continue all of Mr. Denson's prescribed medications, including Prednisone, so that his sarcoidosis was not exacerbated. Id. Dr. Mendel testified that the individual defendants' failure to respond to the sarcoidosis exacerbation was conduct that "fell far below the standard of care." Id. 7(g). Dr. Mendel concluded that "the misconduct of the Defendant medical providers caused Denson to have a bad outcome that probably would not have occurred had Defendants complied with the standard of care." Id.

11

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   A party seeking summary judgment has the burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence that shows there is a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. Anderson, 477 U.S. at 255; see also Herzog v. Castle

Rock Entertainment, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material"

only if it can affect the outcome of the lawsuit under the governing legal principles.

Anderson, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would

permit a reasonable jury to return a verdict for the nonmoving party. Id.

    "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party," summary judgment for the moving party is proper. Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

    Defendants argue they are entitled to summary judgment on Plaintiffs' 1983

claim because, *inter alia*, Plaintiffs' claim does not rise to the level of deliberate

indifference. Br. in Supp. of Defs' Mot. for Summ. J. ("Defs.' Br.") [Doc. 72-2] at

20-23. Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.   To establish a claim pursuant to § 1983, a plaintiff must prove that he was deprived of a right secured by the Constitution or laws of the United States, and that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law.   Allaben v. Howanitz, 579 F. App'x 716, 718 (11th Cir. 2014).   Section 1983 does not create any substantive federal rights; it merely provides remedies for deprivations of rights established elsewhere.   Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1265 (11th Cir. 2010).

As applied to inmates, it is well settled that the Eighth Amendment encompasses a right to medical care for serious medical needs.   See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment") (internal citation omitted).   "However, not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Roy v. Corr. Med. Servs., Inc., 522 F. App'x 597, 600 (11th Cir. 2013) (quoting McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir.1999)).   When discussing the contours of the Eighth Amendment's prohibition of deliberate indifference to prisoner's medical needs, the Supreme Court has held:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical

> mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

Estelle, 429 U.S. at 106. The elements for a 1983 claim alleging deliberate indifference are: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (internal quotations and citation omitted). Additionally, a plaintiff who brings a deliberate indifference claim must show proximate cause, i.e. that the state actor's allegedly unconstitutional act caused the injury. Gary v. Modena, No. 03:00337-CV-WDO, 2006 U.S. App. LEXIS 31640, at *12 (11th Cir. Dec. 21, 2006).

The Eleventh Circuit jurisprudence on this issue sheds some light on the difference between deliberate indifference proscribed by the Eighth Amendment and non-actionable negligence. For example, the Eleventh Circuit has held that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cnty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997) (involving an alcoholic inmate with seizure disorder when in

15

withdrawal whose medical needs were wholly ignored); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989) ("[K]nowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference"); Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir.1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").

Deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.  Steele v. Shah, No. 92-52-CIV-ORL-18, 1996 U.S. App. LEXIS 23301, at *14 (11th Cir. Sept. 5, 1996) (holding that a genuine issue of fact regarding the question of whether discontinuation of psychotropic drug to inmate who was a known suicidal risk was grossly negligent or legitimate medical judgment precluded summary judgment); Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir.1989) (holding that summary judgment was precluded by a genuine dispute between experts on the question of whether the doctor's acts depriving a mentally prisoner of lithium constituted legitimate medical practice or either gross incompetence or the deliberate choice of an easier but less efficacious course of treatment).

16

Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d at 789 (holding that the denial of a directed verdict on deliberate indifference claim was not in error where evidence showed that over a several-month period, an inmate with a broken leg was only given muscle relaxants and was not afforded the opportunity to get an x-ray or private treatment at his own expense).

### A.   Sufficiently Serious Medical Need

It is undisputed that Mr. Denson had a long history of sarcoidosis and that Dr. Tesfaye and Nurse Anderson were aware of this diagnosis. Defs.' SMF ¶¶ 5-8. Tesfaye Dep. at 96; Anderson Dep. at 26. Sarcoidosis is an inflammatory disease that can have a serious negative impact on multiple organs. Tesfaye Dep. 62. The disease is sometimes asymptomatic or can clear up without any medical intervention, see Tesfaye Dep. at 65, but in other cases, it is a life-threatening disease. Mendel Aff. ¶ 7(b). The evidence shows that Nurse Russell was not aware of Mr. Denson's sarcoidosis at the time she treated him, but that she was aware he was complaining of having trouble breathing. Russell Dep. at 41-42.

The Eleventh Circuit has held that a "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious

17

that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Regional Youth Detention Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994). Viewed in a light most favorable to Plaintiffs, the facts of this case show that Mr. Denson's sarcoidosis was a condition for which medical professionals had ordered treatment with Prednisone over a course of years. As such, Plaintiffs have established that Mr. Denson had a serious medical need and that Dr. Tesfaye and Nurse Anderson were aware of this condition. Further, the evidence shows that Nurse Russell was aware that Mr. Denson was having trouble breathing, an obvious serious medical need which, if true, would necessitate medical treatment.

### B.   Deliberate Indifference to Sarcoidosis

Having found a sufficiently serious medical need, the question now turns to whether the evidence, viewed in a light most favorable to Plaintiffs, shows that Defendants' course of action with regard to the treatment of Mr. Denson's serious medical need rose to the level of deliberate indifference. The Court will examine Plaintiffs' claims against the medical care provided by Defendants individually, in order to determine whether each had a sufficiently culpable state of mind. See, e.g., Phillips v. Roane Cnty., 534 F.3d 531, 542 (6th Cir. 2008) ("The subjective

component of a deliberate indifference claim must be addressed for each officer individually.") (citation and quotation omitted).

### 1.   Dr. Tassew Tesfaye

Viewed in a light most favorable to Plaintiffs, the evidence shows that Dr. Tesfaye saw and treated Mr. Denson at midnight on November 30, 2011, related to Mr. Denson's complaints about being short of breath. The doctor noted that Mr. Denson had a history of sarcoidosis and was making wheezing sounds, but determined that the wheezing was not coming from his chest (which he believed would be the case if the sarcoidosis were causing the shortness of breath). Dr. Tesfaye observed that Mr. Denson was not using accessory muscles in his chest and there was no intercostal or subcostal retraction when he breathed. Dr. Tesfaye deduced that the wheezing was coming from his upper respiratory system, likely caused by the septal deviation. The doctor tested Mr. Denson oxygen saturation level and it was 98%. All of these factors indicated to Dr. Tesfaye that Mr. Denson was not in respiratory distress at that time and, therefore, that his sarcoidosis was not causing him distress. Dr. Tesfaye administered a breathing treatment and noted that Mr. Denson walked back to his cell on his own accord. Although Dr. Tesfaye saw that he had been prescribed Prednisone and he recognized it as a drug to treat sarcoidosis, he did not verify that this drug had been administered to Mr.

19

Denson, nor did he follow-up to ensure that Prednisone was administered to Mr. Denson.

With regard to this initial visit Dr. Tesfaye had with Mr. Denson, Plaintiffs' expert contends that Dr. Tesfaye's treatment, specifically his failure to treat the sarcoidosis, was "inadequate." Mendel Aff. ¶ 5(l). With regard to this initial visit, the Court finds that Plaintiffs' allegations fall short of the deliberate indifference to prove a claim under 42 U.S.C. § 1983. "Inadequate" medical treatment does not rise to the level of deliberate indifference. At most, Plaintiffs' allegations raise a question of differing medical opinions about medical treatment, not deliberate indifference.

Plaintiffs' expert also opined that Dr. Tesfaye's failure to re-evaluate Mr. Denson was "gross departure from the standard of care, as was his instruction for the nurses to evaluate his condition solely on the basis of a pulse oximetry reading." Id. Further, Plaintiffs contend that Dr. Tesfaye failed to take Mr. Denson's complaints seriously. Pls.' Resp. to Defs.' Mot. for Summ. J. [Doc. 83] at 11. Viewed in a light most favorable to Plaintiffs, the evidence shows that in the time frame immediately following the initial visit where Dr. Tesfaye found Mr. Denson to be breathing fine, he fielded at least one inquiry from the nursing staff during the one o'clock hour. Dr. Tesfaye assessed Mr. Denson's complaint, which

consisted of the identical symptoms to those he treated (he felt successfully) just one hour earlier. He then instructed the nurse to check Mr. Denson's oxygen saturation level (98%) which confirmed to him that Mr. Denson was still not in respiratory distress, consistent with his earlier examination. The Court finds that this action on the part of Dr. Tesfaye does not rise to the level of deliberate indifference. Given the positive findings following Dr. Tesfaye's first examination of Mr. Denson and the subsequent oxygen saturation level finding of 98%, the court finds that Dr. Tesfaye did not exhibit deliberate indifference in declining to personally re-examine Mr. Denson again so soon after the initial visit. Viewed in a light most favorable to Plaintiffs, Dr. Tesfaye was confronted with a situation in which a patient presented complaints identical to the complaints he treated successfully approximately an hour earlier. Far from dismissing Mr. Denson's complaints, Dr. Tesfaye asked the nurse to perform an oxygen saturation test on Mr. Denson to give an objective indication of whether, in fact, Mr. Denson was in respiratory distress. Consistent with the earlier findings, the test came back negative.

Finally, Plaintiffs' expert opines that at 3:44 a.m., once a stretcher had been called for Mr. Denson's emergency, methylprednisolone, a rapidly acting steroid, should have been administered. Mendel Aff. ¶¶ 5(k), 7(c). The Court finds this

allegation amounts to differing medical judgment, in effect second-guessing Dr.

Tesfaye's treatment, not deliberate indifference.  Dr. Tesfaye came to Mr. Denson

within one minute of learning of the emergency.  Examining Mr. Denson and

determining that Mr. Denson's condition was in immediate need of care he could

not provide in the Fulton County jail, he immediately brought him back to the

urgent care clinic, administered oxygen and called 911.  Tesfaye Dep. 157-59.  The

conduct on the part of Dr. Tesfaye, viewed in a light most favorable to Plaintiffs

and taken collectively or separately simply does not rise to the level of deliberate

indifference.  See Waldrop v. Evans, 871 F.2d at 1033 (citing Bowring v. Godwin,

551 F.2d 44, 48 (4th Cir. 1977) ("We disavow any attempt to second-guess the

propriety or adequacy of a particular course of treatment. Along with all other

aspects of health care, this remains a question of sound professional judgment.")).

Indeed, "[w]here a prisoner has received some medical attention and the dispute is

over the adequacy of the treatment, federal courts are generally reluctant to second

guess medical judgments and to constitutionalize claims which sound in state tort

law." Arflack v. Cnty. of Henderson, Kentucky, 412 F. App'x 829, 832 (6th Cir.

2011) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); see

Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001) ("When a prison doctor

provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not

22

displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.").

### 2.    Nurse Camela Anderson

Viewed in a light most favorable to Plaintiffs, the evidence shows that Nurse Anderson was aware of Mr. Denson's sarcoidosis and was made aware of his immediate condition (complaining of shortness of breath) sometime after 1:15 a.m. and then personally examined him at 1:30 a.m. During this examination, she observed that he was sitting up, talking normally, not using any accessory muscles to breathe, and breathing fine and not in any distress; she then tested his oxygen saturation level, which was 98% (within normal limits). Id. at 20, 23, 36, 44-45, 63. Nurse Anderson said that when she examined him, Mr. Denson reported that he had a history of asthma and sarcoidosis, but he was "feeling better" and that he was getting relief from the breathing treatments he had been given earlier. Id. at 39-40. Mr. Denson told Nurse Anderson that he needed Prednisone. Id. at 40-41. Nurse Anderson confirmed that Mr. Denson was prescribed Prednisone, but never administered him any Prednisone despite the fact that it was available at the urgent care clinic. The evidence also showed that Nurse Anderson had a conversation with Corrections Officer Bridgette Lewis during this time frame about Mr. Denson

in which Nurse Anderson ultimately said "[w]hen he passes out and falls on the floor, call me." Lewis Aff., Ex. A.

The Court finds that Nurse Anderson's attention to, and interaction with Mr. Denson, including an examination that included numerous indications that Mr. Denson was not in respiratory distress, did not amount to deliberate indifference. Indeed, Mr. Denson himself told her that he was "feeling better" and that he was getting relief from the breathing treatments he had been given earlier. Based on the evidence viewed in a light most favorable to Plaintiffs, Nurse Anderson's statement to the corrections officer, although possibly inappropriate or callous, was in no way indicative of her treatment of Mr. Denson.

Nurse Anderson's last interaction with Mr. Denson around 3:40 a.m. was likewise not characteristic of deliberately indifferent care. Viewed in a light most favorable to Plaintiffs, she arrived within minutes of fielding the call from the corrections officer(s), which indicated that Mr. Denson's condition was in immediate need of care. She promptly checked his pulse and, based on her observations of Mr. Denson, immediately elevated the situation by calling back to the urgent care clinic for a stretcher to transport Mr. Denson back to the urgent care clinic. Nothing about this was deliberately indifferent to Mr. Denson's serious medical needs.

### 3.    Nurse Laquanta Russell

The Court finds that Nurse Russell's interaction with Mr. Denson was the least culpable of all the individual Defendants.  Viewed in a light most favorable to Plaintiffs, the evidence shows that Nurse Russell's first interaction with Mr. Denson was the result of a phone call she fielded from the Unit Three South sometime after 1:00 a.m.  Nurse Russell immediately took the complaint to Dr. Tesfaye, the doctor assigned to the critical care unit and the doctor who had examined Mr. Denson approximately one hour earlier.  Nurse Russell, despite being assigned to the medical observation psychiatric unit, took it upon herself to carry out Dr. Tesfaye's direction, rather than just relaying the instruction back to the nurse assigned to the Unit Three South.  Pursuant to the doctor's instruction, she tested Mr. Denson's oxygen saturation level and reported the 98% finding back to Dr. Tesfaye who informed her that this was within the normal range as they had already treated his shortness of breath.  Although Nurse Russell did not take a stethoscope to this examination, did not take it upon herself to administer Prednisone, and did not perform a full assessment of Mr. Denson or re-examine him afterwards, Nurse Russell was not the Unit Three South nurse, nor was she even assigned to the critical care unit.  Although she noticed that Mr. Denson was taking deep breaths, she also confirmed a high oxygen saturation level (98%), well

25

within normal limits.   Nurse Russell also informed all of the interested individuals who were treating Mr. Denson at the time of her findings and instructed those individuals (corrections officer(s) and the Unit Three South nurse) to bring Mr. Denson to the critical care unit if he was having trouble breathing.   Viewed in a light most favorable to Plaintiffs, the Court finds nothing about Nurse Russell's treatment of Mr. Denson was deliberately indifferent.

Having found that the evidence, viewed in a light most favorable to Plaintiffs, fails to establish that any of the individual Defendants acted with deliberate indifference toward Mr. Denson, the Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to Count I of the Second Amended Complaint.

### C.   Plaintiffs' State Law Claim for Negligence

The Court having determined that summary judgment is due to be granted as to Plaintiffs' federal claim under 42 U.S.C. § 1983, the only remaining claim in the above-styled case is Count II alleging negligence.   Plaintiffs have not pled a basis for original jurisdiction over the claim for negligence and none is apparent from the record.   Accordingly, this Court declines to exercise jurisdiction over this pendent state-law claim and **DISMISSES** Count II without prejudice.   "The district courts may decline to exercise supplemental jurisdiction over a claim under

26

subsection (a) if . . . the district court has dismissed all claims over which it has

original jurisdiction . . ." 28 U.S.C § 1367(c)(3). The Eleventh Circuit "ha[s]

encouraged district courts to dismiss any remaining state claims when . . . the

federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370

F.3d 1086, 1089 (11th Cir. 2004); see also United Mine Workers v. Gibbs, 383

U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a

matter of comity and to promote justice between the parties, by procuring for them

a surer-footed reading of applicable law. Certainly, if the federal claims are

dismissed before trial, even though not insubstantial in a jurisdictional sense, the

state claims should be dismissed as well."); Mergens v. Dreyfoos, 166 F.3d 1114,

1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are

dismissed prior to trial, Gibbs strongly encourages or even requires dismissal of

state claims.'" (quoting L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d

414, 428 (11th Cir. 1984))); Dockens v. DeKalb Cnty. Sch. Sys., 441 F. App'x.

704, 709 (11th Cir. 2011) ("Once the district court properly granted summary

judgment for the School System on the FMLA claims, no federal claims remained.

It was not abuse of discretion for the court to decline supplemental jurisdiction

over the state law claim.").

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motion for Summary Judgment [Doc. 72] is **GRANTED** as to Count I of Plaintiffs' Second Amended Complaint. Moreover, this Court declines to exercise jurisdiction over Count II of Plaintiffs' Second Amended Complaint and **DISMISSES** Count II without prejudice.  Having dismissed all of Plaintiffs' claims in the above-styled lawsuit, there are no remaining issues pending before the Court.  Accordingly, the Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 17th day of March, 2015.

MARK H. COHEN
United States District Judge